T.C. Memo. 2012-61

UNITED STATES TAX COURT

SALUS MUNDI FOUNDATION, TRANSFEREE, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 24741-08, 24742-08,  Filed March 6, 2012.
24743-08.

Allen Duane Webber, Summer M. Austin, Jaclyn J. Pampel, Caitlin A.

Urban, Ryan J. Kelly, and Phillip J. Taylor, for petitioners.

John Richard Mikalchus, for respondent.

_____

[1]Cases of the following petitioners are consolidated herewith: Diebold
Foundation, Inc., Transferee, docket No. 24742-08; and Ceres Foundation, Inc.,
Transferee, docket No. 24743-08.

## MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  In separate statutory notices of liability, respondent determined that the Salus Mundi Foundation, the Diebold Foundation, Inc. (Diebold Foundation (Connecticut)), and the Ceres Foundation, Inc. (collectively, petitioners) are liable as transferees of the assets of the Diebold Foundation, Inc. (Diebold Foundation), of $33,542,496[2] each for the corporate income tax, penalty, and accrued interest assessed against Double-D Ranch Inc. (Double-D Ranch), for the taxable year ended July 2, 1999.  The primary issues remaining for decision are:  (1) whether the Diebold Foundation is liable as a transferee pursuant to section 6901[3] for the unpaid Federal income tax and section 6662 accuracy-related penalty owed by Double-D Ranch for the July 2, 1999, taxable year and (2) whether petitioners are liable as transferees of a transferee pursuant to section 6901 for the unpaid Federal income tax and section 6662 accuracy-related penalty owed by Double-D Ranch for the July 2, 1999, taxable year.  For the reasons stated herein, we find that

---

[2]All amounts are rounded to the nearest dollar.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

the Diebold Foundation is not liable as a transferee under section 6901 and therefore petitioners are not liable as subsequent transferees under section 6901.[4]

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated by this reference. Petitioners are three section 501(c)(3) private foundations organized in Arizona, Connecticut, and South Carolina on October 22, July 12, and May 25, 1999, respectively. They received all of the assets of the Diebold Foundation in equal shares pursuant to the Diebold Foundation's "Plan of Dissolution and Distribution of Assets" during the Diebold Foundation's October 31, 2001, taxable year.

I. The Double-D Ranch Shareholders--the Marital Trust and the Diebold Foundation

The Dorothy R. Diebold Marital Trust (marital trust) was created upon the death of Richard Diebold on June 18, 1996, in which Mrs. Diebold was the sole beneficiary. At the time of Mr. Diebold's death, the marital trust owned all issued and outstanding shares of stock (3,835 shares) in the Double-D Ranch. The marital

---

[4]The parties also dispute whether the period of limitations expired before the mailing of the notices of liability to petitioners and thus barred respondent from determining transferee liability. As explained infra, because we ultimately decide that petitioners are not liable as subsequent transferees, it is not necessary that we decide whether the period of limitations expired.

trust had three cotrustees:  (1) Mrs. Diebold; (2) Bessemer Trust Co., N.A. (Bessemer Trust); and (3) Andrew W. Bisset.  Bessemer Trust was a national bank that served as trustee, asset custodian, and investment adviser to the marital trust. Austin Power, Jr., a senior vice president at Bessemer Trust, served as counsel and account manager for both the marital trust and Mrs. Diebold.  Mr. Power was Bessemer Trust's representative in its role as trustee of the marital trust.  Mr. Bisset is an attorney licensed to practice law in Connecticut and New York who served as Mrs. Diebold's personal attorney after her husband's death.

The Diebold Foundation was a section 501(c)(3) charitable organization organized and incorporated on November 12, 1963, under the laws of the State of New York.  Its directors in 1999 were Mrs. Diebold, Mr. Bisset, and Mrs. Diebold's three children.  At the request of Mrs. Diebold, on May 28, 1999, approximately one-third of the outstanding stock of Double-D Ranch (1,280 shares) was transferred from the marital trust to the Diebold Foundation.  Until July 2, 1999, the marital trust and the Diebold Foundation (collectively, the Double-D Ranch shareholders) owned all of the stock of Double-D Ranch--they held 2,555 shares and 1,280 shares, respectively.

## II.  Double-D Ranch

From at least July 2, 1997, until their resignation effective July 1, 1999, Double-D Ranch's directors were Mrs. Diebold, her three children, Mr. Bisset, and Mr. Power.  The assets of Double-D Ranch consisted primarily of:  (1) stock in American Home Products (AHP), a publicly traded company; (2) stock in other publicly traded companies; (3) U.S. Treasury securities; (4) cash; and (5) real estate.[5]  The various securities and real estate had high fair market values, but low tax bases.

## III.  The Decision To Sell Double-D Ranch

At some point in May or early June 1999, the cotrustees of the marital trust and the directors of the Diebold Foundation decided to sell the stock of Double-D Ranch.  Mr. Power was primarily responsible for implementing the sale of the stock. Stephen A. Baxley, a senior vice president in Bessemer Trust's tax department, and Morton Grosz, Richard Leder, and Adam Braverman assisted in the sale.  Messrs. Grosz, Leder, and Braverman were attorneys at Chadbourne & Parke, LLP, a nationally known law firm.  Messrs. Power, Baxley, Grosz, Leder, and Braverman (collectively, Double-D Ranch representatives) represented Double-D Ranch throughout the stock sale process.

---

[5]The real estate consisted of over 500 acres of property in Connecticut.

The Double-D Ranch representatives discussed the sale with two groups of purchasers:  (1) James M. Rhodes, Harry Zelnick, and Ari Bergmann (collectively, Shap II[6] representatives); and (2) Fortrend International, LLC (Fortrend).  The Double-D Ranch representatives initially met with the Shap II representatives on May 26, 1999, and with Fortrend on June 1, 1999.  Both purchasers presented a similar interest--purchasing the stock of closely held corporations holding assets with high fair market values but low tax bases.  While it is not entirely clear what details were discussed at these meetings, the parties did address:   (1) the valuation method for the AHP stock; (2) the financial statements, tax returns, and contracts that the seller would need to provide the purchaser; and (3) the real estate held by Double-D Ranch.

The Double-D Ranch representatives ultimately decided to sell the Double-D Ranch stock to the Shap II representatives and gained the approval of Mrs. Diebold and her children in their various capacities.  The Shap II representatives created Shap Acquisition Corp. II (Shap II) to serve as the acquirer of the Double-D Ranch stock, with Mr. Rhodes and Mr. Zelnick serving as Shap II's directors and officers.  While it is not clear at what level of detail the parties discussed the structure of the

---

[6]Shap II (discussed infra) was an entity created for the purchase of the Double-D Ranch stock.

transaction, the Double-D Ranch representatives assumed that Shap II would use some form of tax strategy to offset the built-in gains in Double-D Ranch's assets.

IV.  The Letter of Intent and the Valuation of Double-D Ranch

Representatives from both the seller and the purchaser negotiated the price and drafted the transaction documents.  On June 17, 1999, Shap II and the Double-D Ranch shareholders executed a letter of intent confirming the terms of the stock sale.  The letter of intent was signed by Mr. Rhodes, Mr. Power, and Mr. Bisset, acting on behalf of Shap II, the marital trust, and the Diebold Foundation, respectively.

Attached to the letter of intent was a term sheet defining the terms of the sale.  The term sheet reflected that Shap II[7] would purchase all issued and outstanding Double-D Ranch stock for cash in an amount equal to the fair market value of the corporation's assets minus an agreed-upon discount.  The agreed-upon discount was

---

[7]The letter of intent indicated that the purchaser was "XYZ Corporation, a special purpose entity" until the actual purchaser was identified or organized.  On June 21, 1999, Shap II was incorporated in the State of Delaware to purchase the Double-D Ranch stock.

set equal to 4.5% of the fair market value of the Double-D Ranch assets less

Double-D Ranch's tax basis in those assets.[8]

As discussed above, Double-D Ranch held mostly marketable securities and

real estate. An appraiser valued the real estate at $6,340,000 on July 2, 1999. Most

of the securities were easily valued on various securities exchanges, except for the

AHP stock. Because Double-D Ranch owned such a large block of AHP stock,

selling it all at once in the stock market would have an impact on the stock's value.

Therefore, the parties to the Double-D Ranch stock sale decided to value the AHP

stock using the "Volume Weighted Average Price" for the five consecutive trading

days before the stock sale closing. The average of the weighted prices was

considered the value of the AHP stock.

The Double-D Ranch assets were valued as follows:

| Item | Amount |
| --- | --- |
| Cash | $21,125,554 |
| AHP stock | 129,085,440 |
| Other securities | 162,335,803 |
| Land--farm | 6,340,000 |
| | 318,886,797 |

---

[8]For example, if fair market value is $300 and the tax basis is $100, the agreed-upon discount would be $8.50 [4.25% x ($300 - $100)].

Double-D Ranch's marketable securities were held in two accounts with Bessemer

Trust; the remaining marketable securities were held in an account with the Bank of

New York.

V.  The Stock Purchase Agreement

On June 25, 1999, Shap II and the Double-D Ranch shareholders executed a

stock purchase agreement.  Mrs. Diebold, Mr. Power (as representative for

Bessemer Trust), and Mr. Bisset signed on behalf of the marital trust.  Mr. Bisset

signed on behalf of the Diebold Foundation, and Mr. Rhodes signed on behalf of

Shap II.  The stock purchase agreement indicated that the closing for the sale would

occur on July 1, 1999.  The parties established additional bank accounts to handle

the various fund transfers made pursuant to the stock purchase agreement.  Finally,

the parties agreed in article VII, section 7.3 of the stock purchase agreement that--

> [Shap II] will file a consolidated federal income tax return (and, where
> applicable, state and local tax returns) for the period which includes the
> Closing Date, which returns will include * * * [Double-D Ranch] from
> and including the day following the Closing Date * * *.  [Shap II] * * *
> will be responsible for, will pay or cause to be paid, any and all Taxes of
> * * * [Double-D Ranch] with respect to any taxable period ending after
> the Closing Date.

## VI. The Escrow Agreement

On July 1, 1999, the Double-D Ranch shareholders entered into an escrow agreement with Bessemer Trust where: (1) Bessemer Trust would serve as the shareholders' representatives for all matters relating to the stock purchase agreement; and (2) an escrow account would be created with Bessemer Trust whereby Bessemer Trust would act as the escrow agent.

The Double-D Ranch shareholders agreed to deposit a portion of the proceeds from the stock sale into the escrow account for the purpose of satisfying any outstanding business obligations of Double-D Ranch that may have existed before the stock sale. Similarly, Shap II agreed to "hold back" $10 million of the stock purchase price and deposit it in the escrow account. This amount would become payable to the Double-D Ranch shareholders on or before July 9, 1999, subject to any adjustments relating to certain liabilities of Double-D Ranch.

## VII. Shap II's Financing

Shap II financed its purchase of the Double-D Ranch stock with a loan from Rabobank Nederland (Rabobank). Rabobank issued a loan commitment letter to Shap II indicating: (1) its agreement to lend up to $325 million for the acquisition of the Double-D Ranch stock; (2) that the loan was to mature no later than 30 days from closing; and (3) as collateral for the loan, Shap II would grant Rabobank a first

priority lien on the stock of Double-D Ranch and any property Shap II "now has or hereafter shall have any interest, as well as other collateral as mutually acceptable." A copy of the commitment letter was provided to the Double-D Ranch representatives on June 22, 1999. The Double-D Ranch shareholders and their representatives were not listed as a party to the financing agreements between Rabobank and Shap II.

Rabobank imposed certain conditions as part of its agreement to lend the $325 million. The biggest condition was that Shap II enter into a binding agreement to sell the Double-D Ranch assets after Shap II purchased Double-D Ranch's stock. To that end, Shap II and Morgan Stanley executed a document titled "Execution by Morgan Stanley of Volume-Weight Average Price and Market-on-Close Trades on Risk Basis" (Shap II-Morgan Stanley sale agreement). Pursuant to this agreement, Morgan Stanley agreed to purchase and Shap II agreed to deliver 2.4 million shares of AHP stock and various other securities (or their cash equivalent) to Morgan Stanley on the "closing date"[9] without regard to whether the transaction between the Double-D Ranch shareholders and Shap II closed. The securities sold pursuant to the Shap II-Morgan Stanley agreement were valued by the same methods used by

---

[9]The Shap II-Morgan Stanley agreement initially defined the closing date as July 1, 1999, but it was later changed to July 6, 1999.

Shap II to value the Double-D Ranch assets for the Double-D Ranch stock sale.

Neither Double-D Ranch nor the Double-D Ranch shareholders were a party to this

agreement. On June 29, 1999, Shap II opened an account with Morgan Stanley to

receive custody of the marketable securities owned by Double-D Ranch.[10]

## VIII. The Stock Sale Closing

The closing was delayed from July 1 to July 2, 1999, and the stock purchase

agreement was amended accordingly. Pursuant to the amended stock purchase

agreement, Shap II would pay $307 million for the Double-D Ranch stock--$297

million payable immediately and $10 million held back and placed in escrow.

Shap II became the owner of all the shares of Double-D Ranch stock on July

2, 1999, after the execution of various closing documents and the requisite money

transfer of $297 million to the escrow account at Bessemer Trust.[11] The closing

documents included, among other documents, the following (all discussed infra):

---

[10]Double-D Ranch's securities were in the custody of Bessemer Trust as of July 2, 1999. Morgan Stanley did not receive custody of any marketable securities in that account before July 6, 1999.

[11]Rabobank deposited $297,975,000 into Shap II's Rabobank account; then $297 million was transferred to the escrow account at Bessemer Trust and $975,000 was transferred back to Rabobank for its fee for assisting in the transaction.

(1) the notice of pledge and security agreement; (2) the transfer agreement; and (3) the letter agreement. At the time of the Double-D Ranch stock sale, Double-D Ranch owned, controlled, and possessed assets having a fair market value well in excess of its liabilities.

The transfers of Double-D Ranch's assets were arranged as follows: (1) custody of the assets held by the Bank of New York were to be transferred to Shap II's Morgan Stanley account on July 6, 1999, after the Bank of New York received written confirmation from Mr. Bisset that the stock sale was consummated; and (2) custody of the assets held by Bessemer Trust were to be transferred to Shap II's Morgan Stanley account on July 6, 1999, pursuant to a letter agreement (transfer agreement) executed on July 2, 1999, between Bessemer Trust, Double-D Ranch, and Shap II. The transfer agreement irrevocably instructed Bessemer Trust to transfer custody of Double-D Ranch's assets to Shap II's Morgan Stanley account and "to not honor any other request or instruction which would cause Bessemer to be unable to make such transfer."

Moreover, the closing documents included an option contract between Double-D Ranch and Toplands Farm, LLC (Toplands Farm).[12] Pursuant to this

[12]Toplands Farm was formed by one of the Diebold children in order to purchase and operate a farm on the real estate.

contract, Toplands Farm paid $1,000 for an option to purchase Double-D Ranch's

real estate for its fair market value as of July 2, 1999. Toplands Farm paid Shap II

a downpayment of $317,000 on July 28, 1999, and a final payment of $6,022,000

on August 27, 1999.[13]

On July 9 and 12, 1999, Shap II paid the Double-D Ranch shareholders the

"hold back" amount and additional purchase price adjustments. Ultimately, the

Double-D Ranch shareholders received the following consideration for their stock:

| Item | Date | Amount |
|------|------|--------|
| Payment at closing | 7/2/1999 | $297,000,000 |
| Hold back and adjustment | 7/9/1999 | 11,556,321 |
| Price adjustment | 7/12/1999 | 608,800 |
| Price adjustment | 7/12/1999 | 34,066 |
| Total | | 309,199,187 |

The following amounts were distributed from the escrow account to the

marital trust:

---

[13]The $1,000 option, the $317,000 downpayment, and the $6,022,000 final payment total $6,340,000--the fair market value per the appraisal.

| Item | Amount |
|---|---|
| Distribution--7/6/1999 | $183,879,480 |
| Distribution--7/12/1999 | 8,276,028 |
| Distribution--11/8/1999 | 10,541,167 |
| Distribution--3/26/2004 | 3,754,850 |
| Distribution--4/15/2004 | 6,989 |
| Total | 206,458,514 |

The following amounts were distributed from the escrow account to the Diebold Foundation:

| Item | Amount |
|---|---|
| Distribution--7/6/1999 | $92,120,520 |
| Distribution--7/12/1999 | 4,156,098 |
| Distribution--11/8/1999 | 5,280,900 |
| Total | 101,557,518 |

The transfers from the escrow account at Bessemer Trust to the marital trust and the Diebold Foundation were made pursuant to the escrow agreement. The 2004 distributions to the marital trust corrected a misallocation made at the time of the stock sale.

## IX. Post-Closing Transfers

On July 2, 1999, following the close of the Double-D Ranch stock sale: (1) Mr. Rhodes executed a letter agreement (the letter agreement) that irrevocably

instructed Bessemer Trust to transfer custody of Double-D Ranch's assets to Morgan Stanley on July 6, 1999, in settlement of the Shap II-Morgan Stanley sale agreement made on June 25, 1999; (2) Mr. Rhodes, as president of Shap II, sent a letter to Morgan Stanley instructing them to transfer $258,546,764 to Shap II's Rabobank account on July 6, 1999; and (3) Morgan Stanley and Double-D Ranch entered into a "Pledge and Security Agreement" which granted Morgan Stanley a security interest in the assets held in Double-D Ranch's Bessemer Trust account. Pursuant to the pledge and security agreement, Morgan Stanley agreed that it would not take possession of the assets before July 6, 1999. Mr. Rhodes sent notice of the pledge and security agreement to Bessemer Trust on July 2, 1999. Neither the Double-D Ranch shareholders nor their representatives were a party to the pledge and security agreement.

On July 6, 1999, Bessemer Trust and the Bank of New York transferred Double-D Ranch's assets to Shap II's Morgan Stanley account. Shortly thereafter Rabobank's loan was repaid. Shap II received the following from its sales of the Double-D Ranch assets:

| Item | Amount |
|------|--------|
| Securities | $291,230,614 |
| Land | 6,340,000 |
| Cash | 21,126,554 |
| Total | 318,697,168 |

## X. Return Filings

The Double-D Ranch shareholders timely filed returns that reflected the sale of their Double-D Ranch stock to Shap II on July 2, 1999. The Diebold Foundation reported capital gain with respect to the sale of its 1,280 shares on Form 990-PF, Return of Private Foundation, for its taxable year ended October 31, 1999.

Double-D Ranch timely filed Form 1120, U.S. Corporation Income Tax Return, for its short taxable year ended July 2, 1999, and checked the "final return" box on the return. This return did not report any of Double-D Ranch's asset sales made after the July 2, 1999, stock sale between the Double-D Ranch shareholders and Shap II.

Shap II timely filed a consolidated income tax return with Double-D Ranch for its taxable year ended on June 30, 2000. Shap II's return reported all of the asset sales made by Double-D Ranch between July 2, 1999, and June 30, 2000, but

also reported artificial losses,[14] resulting in Shap II's reporting no tax liability for its June 30, 2000, taxable yearend.

XI. Procedural History

On March 10, 2006, respondent issued a notice of deficiency to Double-D Ranch, determining a deficiency in income tax of $81,120,064 and a section 6662 penalty of $16,224,012 for the short taxable year ended on July 2, 1999. Respondent determined that the sale of Double-D Ranch's stock by the Double-D Ranch shareholders to Shap II should not be respected for Federal income tax purposes. Respondent determined that in substance the stock sale was really a sale of Double-D Ranch's assets followed by a liquidating distribution to the Double-D Ranch shareholders. While the notice of deficiency was issued after the three-year period of limitations, respondent contends that the six-year period of limitations

---

[14]The artificial losses arose from some form of Son-of-BOSS transaction. See Notice 2000-44, 2000-2 C.B. 255 (describing so-called Son-of-BOSS transactions); see also Kligfeld Holdings v. Commissioner, 128 T.C. 192, 194 (2007) (discussing the prototypical Son-of-BOSS transaction).

under section 6501(e) applies.[15]  Double-D Ranch did not file a petition with this

Court, and respondent assessed the following amounts against Double-D Ranch on

July 31, 2006:

| Item | Amount |
|------|--------|
| Tax | $81,120,064 |
| Sec. 6662 penalty | 16,224,013 |
| Interest | 3,171,631 |

Respondent could not find any assets of Double-D Ranch from which to collect the

assessed liability and determined that any additional efforts would be futile.

On August 7, 2007, respondent issued a notice of liability to Mrs. Diebold as

the transferee of the assets of Double-D Ranch in the amount of $97,344,077 for the

corporate income tax, penalty, and accrued interest assessed against Double-D

Ranch for the taxable year ended July 2, 1999.  Mrs. Diebold timely filed a petition,

and a trial was held.  In Diebold v. Commissioner, T.C. Memo. 2010-238, we found

that the separate legal existence of the marital trust should not be disregarded and

---

[15]Respondent's contention that the six-year period of limitations should apply is also predicated on the assumption that the stock sale should be recast as an asset sale followed by a liquidating distribution.

that respondent had not met his burden of showing that Mrs. Diebold was liable as a transferee of the marital trust.  As a result, we held that Mrs. Diebold was not liable as a transferee of Double-D Ranch.

Respondent also determined that the Diebold Foundation was liable as a transferee of Double-D Ranch.  However, pursuant to its plan of dissolution and distribution of assets effective on January 29, 2001, the Diebold Foundation distributed all of its assets in equal shares to petitioners, resulting in each petitioner's receiving $32,918,670 from the Diebold Foundation.[16]  These transfers were not made in exchange for any property or in satisfaction of an antecedent debt.

On July 11, 2008, respondent issued a notice of liability to each petitioner as a transferee of the assets of the Diebold Foundation in the amount of $33,542,496 for the corporate income tax, penalty, and accrued interest assessed against Double-D Ranch for the taxable year ended on July 2, 1999.  Petitioners timely filed petitions in this court, and the cases have been consolidated and are before this court for a decision without trial under Rule 122.[17]

---

[16]The plan was approved by the Supreme Court of the State of New York.

[17]The parties agree that the same evidence that was used in Diebold v. Commissioner, T.C. Memo. 2010-238, should be used in the present case, including

(continued...)

OPINION

Section 6901(a)(1) is a procedural statute authorizing the assessment of transferee liability in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the transferee liability was incurred. Section 6901(a) does not create or define a substantive liability but merely provides the Commissioner a remedy for enforcing and collecting from the transferee of the property the transferor's existing liability. Coca-Cola Bottling Co. v. Commissioner, 334 F.2d 875, 877 (9th Cir. 1964), aff'g 37 T.C. 1006 (1962); Mysse v. Commissioner, 57 T.C. 680, 700-701 (1972). Section 6902 and Rule 142(d) provide that the Commissioner has the burden of proving the taxpayer's liability as a transferee but not of showing that the transferor was liable for the tax.

Under section 6901(a) the Commissioner may establish transferee liability if a basis exists under applicable State law or State equity principles for holding the transferee liable for the transferor's debts. Commissioner v. Stern, 357 U.S. 39, 42-47 (1958); Bresson v. Commissioner, 111 T.C. 172, 179-180 (1998), aff'd, 213 F.3d 1173 (9th Cir. 2000); Frank Sawyer Trust of May 1992 v. Commissioner, T.C.

---

[17](...continued)
the trial testimony. As a result, under Rule 122, these cases do not require a trial for the submission of evidence.

Memo. 2011-298; Starnes v. Commissioner, T.C. Memo. 2011-63; Diebold v. Commissioner, T.C. Memo. 2010-238. "[T]he existence and extent of liability should be determined by state law." Commissioner v. Stern, 357 U.S. at 45. Thus, State law determines the elements of liability, and section 6901 provides the remedy or procedure to be employed by the Commissioner as the means of enforcing that liability. Ginsberg v. Commissioner, 305 F.2d 664, 667 (2d Cir. 1962), aff'g 35 T.C. 1148 (1961).

Moreover, transferee liability may be asserted against a transferee of a transferee. Berliant v. Commissioner, 729 F.2d 496 (7th Cir. 1984), aff'g Magill v. Commissioner, T.C. Memo. 1982-148. The Commissioner may collect unpaid taxes of a transferor of assets from a transferee or a successor transferee of those assets. Sec. 6901(a), (c)(2); Commissioner v. Stern, 357 U.S. at 42; Stansbury v. Commissioner, 104 T.C. 486, 489 (1995), aff'd, 102 F.3d 1088 (10th Cir. 1996). The Commissioner bears the burden of proving that a party is liable as a transferee under State law or in equity. Sec. 6902(a); Rule 142(d); Gumm v. Commissioner, 93 T.C. 475, 479-480 (1989), aff'd without published opinion, 933 F.2d 1014 (9th Cir. 1991).

## I. Parties' Arguments

Petitioners argue that they cannot be liable as transferees because respondent failed to issue the notices of liability within the applicable three-year period of limitations set forth in section 6901(c)(2), and that the six-year period of limitations in section 6501(e)(1)(A) does not apply because Double-D Ranch did not sell its marketable securities during the July 2, 1999, taxable year. Moreover, petitioners argue that they cannot be liable as transferees because Double-D Ranch itself was not liable for the deficiency and penalty respondent determined in his notice of deficiency for the July 2, 1999, taxable year. Alternatively, if Double-D Ranch is found liable for the income tax and penalty respondent determined in his notice of deficiency, petitioners argue they are not liable under New York fraudulent conveyance law because: (1) Double-D Ranch did not convey any property to the Diebold Foundation; and (2) Double-D Ranch was solvent at the time of its stock sale.

Respondent argues that the six-year period of limitations under section 6501(e) applies to the assessment and collection of Double-D Ranch's liability for the short taxable year ended July 2, 1999, because Double-D Ranch omitted an amount in excess of 25% of gross income stated in the return. Respondent argues that under the substance over form doctrine, the purported sale of Double-D Ranch

stock to Shap II must be disregarded and recast as a sale of Double-D Ranch's assets on July 2, 1999, followed by a liquidating distribution of the proceeds to the Diebold Foundation and the marital trust. Therefore, under either New York fraudulent conveyance law or the trust fund doctrine, the Diebold Foundation is liable as a transferee of Double-D Ranch. Respondent concludes that because the Diebold Foundation is liable as a transferee and transferred all of its assets to petitioners for no consideration, petitioners are liable as subsequent transferees of Double-D Ranch.

Whether the three-year or the six-year period of limitations applies depends on how we decide to characterize the transaction between the Double-D Ranch shareholders and Shap II.[18] Therefore, we must first determine whether respondent

---

[18]In Mills v. Everest Reinsurance Co., 410 F. Supp. 2d 243, 255 (S.D.N.Y. 2006), the court rejected the defendant's assertion that multiple transfers should be collapsed into one transaction for the purpose of determining when the statute of limitations began to run on the plaintiff's fraudulent conveyance claims. The court noted that transactions have never been collapsed to determine whether a fraudulent conveyance is timely under the statute of limitations, stating "because a new claim for fraudulent conveyance accrues at the time of each conveyance, it would be illogical and contrary to the spirit of the law to treat a series of transfers as one transaction for the purpose of determining when the statute of limitations was triggered."

However, Tronox, Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.), 429 B.R. 73, 100 (S.D.N.Y. 2010) rejected this argument in applying the Oklahoma fraudulent transfer statute to a "spin off", reasoning that what constitutes a

(continued...)

has shown that the transactions surrounding the Double-D Ranch stock sale should be collapsed under the New York Uniform Fraudulent Conveyance Act (NYUFCA) in deciding whether the Diebold Foundation is liable as a transferee. If we find the Diebold Foundation liable as a transferee, then we must determine whether petitioners are liable as transferees of a transferee.

II. New York Uniform Fraudulent Conveyance Act

The law of the State where the transfer occurred (in these cases, New York) controls the characterization of the transaction. See Commissioner v. Stern, 357 U.S. at 45. NYUFCA includes provisions imposing transferee liability on grounds of both actual and constructive fraud. See N.Y. Debt. & Cred. Law secs. 273, 276 (McKinney 2001). The elements of fraudulent conveyance claims under NYUFCA are the same as those under the Federal Bankruptcy Code. Ames Dept. Stores, Inc. v. Wertheim Schroder & Co. (In re Ames Dept. Stores, Inc.), 161 B.R. 87, 89 n.1 (Bankr. S.D.N.Y. 1993). Respondent asserts that the Diebold Foundation

---

[18](...continued)
"transfer" under Oklahoma law is very broad, and the Mills transfers were much more straightforward than the case before it.

Because of our factual differences and our holding as explained subsequently, it is not necessary that we address whether a New York court can collapse transactions to determine whether a fraudulent conveyance occurs within the period of limitations.

is liable as a transferee under the constructive fraud provision of NYUFCA.

The constructive fraud provision of NYUFCA provides that "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." N.Y. Debt. & Cred. Law sec. 273. The party asserting that a transfer should be set aside under this section bears the burden of showing fraud by a preponderance of the evidence. Lippe v. Bairnco Corp., 249 F. Supp. 2d 357, 376 (S.D.N.Y. 2003). Accordingly, establishing constructive fraud (and therefore transferee liability) under N.Y. Debt & Cred. Law sec. 273 requires respondent to prove by a preponderance of the evidence: (1) a conveyance; (2) made without fair consideration; (3) by a person who was or will be rendered insolvent by the conveyance. See United States v. McCombs, 30 F.3d 310, 323 (2d Cir. 1994).

A conveyance includes "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." N.Y. Debt. & Cred. Law sec. 270 (McKinney 2001). Fair consideration is given--

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

Id. sec. 272.

Fair consideration must be determined "upon the facts and circumstances of each particular case." Sullivan v. Messed (In re Corcoran), 246 B.R. 152, 159 (S.D.N.Y. 2000) (citing United States v. McCombs, 30 F.3d at 326). Furthermore, under N.Y. Debt. & Cred. Law sec. 271 (McKinney 2001), a person is insolvent when the "present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.".

Respondent's transferee liability claim under NYUFCA is predicated on the assertion that the series of transactions among the Double-D Ranch shareholders, Shap II, Morgan Stanley, and Rabobank should be collapsed and treated as if Double-D Ranch sold all of its assets and then made a liquidating distribution to its shareholders. If the transactions are collapsed accordingly, then Double-D Ranch will have transferred substantially all of its assets to the Diebold

Foundation and the marital trust, receiving virtually nothing in exchange, let alone fair consideration. If the preceding is so found, it follows that the Diebold Foundation will be liable as a transferee of Double-D Ranch's assets under N.Y. Debt. & Cred. Law sec. 273. While intent is generally irrelevant in a constructive fraud action under NYUFCA, when a party is seeking to recharacterize a transaction or series of transactions for purposes of showing no fair consideration was given the party must prove that the multiple transactions were linked and that the transferee had actual or constructive knowledge of the entire scheme that rendered her exchange with the debtor fraudulent. See Sullivan, 246 B.R. at 159 (citing HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir. 1995)); Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.), 284 B.R. 355, 370-371 (Bankr. S.D.N.Y. 2002).

Constructive knowledge may be found where the initial transferee became aware of circumstances that should have led to further inquiry into the circumstances of the transaction, but no inquiry was made. HBE Leasing Corp., 48 F.3d at 636. While some cases have stated that purchasers who do not make appropriate inquiries are charged with "the knowledge that ordinary diligence would have elicited," United States v. Orozco-Prada, 636 F. Supp. 1537, 1543

 (S.D.N.Y. 1986), aff'd without published opinion, 847 F.2d 836 (2d Cir. 1988), others appear to have required a more active avoidance of the truth, see Schmitt v. Morgan, 471 N.Y.S. 2d 365 934, 471 (App. Div. 1983) (test is whether subsequent purchaser who did not make serious inquiry "was shielding himself from knowledge that a fraudulent conveyance had occurred").

The "knowledge" requirement reflects the policy of the Uniform Fraudulent Conveyance Act to protect innocent purchasers for value who received the debtor's property without awareness of any fraudulent scheme and is closely connected to the requirement of "good faith". See Gowan v. Wachovia Bank, N.A. (In re Dreier LLP), 453 B.R. 499, 513 (S.D.N.Y. 2011) (citing HBE Leasing, 48 F.3d at 636) ("UFCA requirement of 'good faith' refers solely to 'whether the grantee knew, or should have known, that he was not trading normally, but that * * * the purpose of the trade, so far as the debtor was concerned, was the defrauding of his creditors.'" (quoting 1 GGFCP sec. 295, at 512 (1940)). The "good faith" inquiry is an objective one that generally asks whether the transferee had information that put it on inquiry notice that the transferor was insolvent, or that the transfer might be made with a fraudulent purpose, and whether a diligent inquiry would have discovered the fraudulent purpose of the transfer. Wachovia Bank, 453 B.R. at 513 (citing Christian Bros. High Sch. Endowment v. Bayou No

Leverage Fund, LLC (In re Bayou Group, LLC), 439 B.R. 284, 310-311 (S.D.N.Y. 2010)) (discussing 11 U.S.C. sec. 548(c)).

HBE Leasing involved the application of NYUFCA in order to collapse multiple transactions on the basis of the knowledge of the transferee. The relevant parties included the debtor corporation, the majority shareholder son, and the mortgagee mother. First, the mortgagee mother made loans to the debtor corporation in exchange for security interests in debtor corporation property. Next, the majority shareholder son had the debtor corporation use the borrowed funds for improper purposes. The primary question was whether these transactions could be collapsed in order to determine whether the debtor corporation received fair consideration in exchange for the security interest granted to the mortgagee mother. The court found that there was sufficient evidence to charge the mortgagee mother with constructive knowledge of the improper expenditures of the borrowed funds (and therefore collapsed the transactions in determining fair consideration under NYUFCA) where: (1) when the mortgagee mother was the director of the debtor corporation, she knew the majority shareholder son had used the debtor corporation as a conduit for making various payments for family and other noncorporate purposes; (2) the mortgagee mother knew the debtor corporation was a defendant in a RICO fraud action; and

(3) the mortgagee mother knew that the majority shareholder son had made large loans to the debtor corporation. The court found that the mortgagee mother had constructive knowledge under these circumstances because her "failure to inquire represented a conscious turning away from the subject." HBE Leasing, 48 F.3d at 637.

In Sunbeam Corp., 284 B.R. at 371 (citing In re Greenbrook Carpet Co., 722 F.2d 659, 661 (11th Cir.1984)), the court stated that a lender may extend a loan to an entity even if it is aware that this entity ultimately intends to use the funds to repay antecedent debt or invest in a speculative venture.. The court reasoned that the fact that a speculative venture turns out to be unprofitable is not grounds to retroactively impute knowledge to the lender that the debtor's investment far exceeded its value. Id. at 372.

On the basis of the authorities discussed, in order to collapse the transactions we must determine whether respondent has shown that in 1999 the Diebold Foundation became aware of circumstances that should have led to further inquiry into the circumstances of the transaction, but no inquiry was made. Because the Double-D Ranch representatives concede that they did not inquire into what Shap II planned on doing, we must determine only whether an inquiry was required.

Respondent asserts that the Double-D Ranch representatives: (1) "[H]ad to have been aware that any tax advantage that Shap II intended to obtain could not have been legitimate"; (2) "knew or should have known that they were engaging the services of a company that marketed transactions that were solely tax motivated and designed to artificially avoid taxes"; and (3) "considering the sophistication and educational level of the representatives, their discussions with Fortrend, Sentinel, and River Run, and the large amount of money at stake, it is not plausible that the representatives were in the dark about the substance of the transaction."

It is clear from the record that the Double-D Ranch representatives knew: (1) Shap II would likely need to sell most of the Double-D Ranch assets in order to repay their 30-day loan from Rabobank; and (2) Shap II was planning on using "tax attributes" to offset the built-in gains of the Double-D Ranch assets.

Respondent also asserts that while Mrs. Diebold may have desired to diversify her portfolio or transfer some assets as gifts, the same objectives could have been accomplished by liquidating Double-D Ranch. However, in the absence of knowledge of a nefarious scheme, when faced with the choice of liquidating the assets of Double-D Ranch or selling its stock, the Double-D Ranch shareholders were not required to choose the result that produced the highest tax liability. They

chose to maximize the cash proceeds by selling the stock of Double-D Ranch rather than liquidating it.

While there is uncertainty as to what the Double-D Ranch representatives were aware of in 1999 concerning the legitimacy of Shap II's actions, we find that their level of awareness about Shap II's plans to engage in some sort of tax strategy did not require, in 1999, the Double-D Ranch representatives to make further inquiry into the circumstances of the transaction. Notice 2001-16, 2001-1 C.B. 730, regarding intermediary transactions had not been released when the stock sale transaction took place.[19] Shap II was an unrelated third party that acquired the benefits and burdens of ownership of Double-D Ranch once the stock sale was complete. There are legitimate transactions that Shap II could have contemplated to offset or defer Double-D Ranch's built-in gains, and respondent has failed to show why the Double-D Ranch representatives should have known that Shap II planned on using a fraudulent tax strategy in order to do so.

---

[19]Notice 2001-16, 2001-1 C.B. 730, was not released until January 19, 2001, and was not published until February 26, 2001. The Internal Revenue Service and the Department of the Treasury issued this notice to alert taxpayers and their representatives of certain responsibilities that might arise from participating in an "intermediary transaction". These transactions were marketed to taxpayers for the avoidance of Federal income taxes. An intermediary transaction generally involved fraudulently structuring the actions of multiple parties (i.e., an asset purchaser, a stock seller, and a stock purchaser) so that assets and stock changed ownership with no resulting Federal income taxes.

Moreover, the facts of these cases are much less egregious than the facts found in HBE Leasing--our transaction is between unrelated parties as opposed to between mother and son; there was no evidence presented that Shap II was a defendant in any relevant legal proceedings; and there has been no finding that the Double-D Ranch representatives had actual knowledge of any past fraudulent activities of Shap II. Furthermore, these cases are similar to Sunbeam in that Shap II's tax strategy can be analogized to a "speculative venture". While the Double-D Ranch representatives knew Shap II planned on engaging in some form of tax strategy, the fact that the strategy failed should not retroactively impute knowledge to the Double-D Ranch representatives that Shap II's plans were specious. Therefore, respondent's assertions that the Double-D Ranch representatives should have known that the transaction was not legitimate are insufficient to support a finding that the Double-D Ranch representatives had constructive knowledge of Shap II's entire scheme.

Furthermore, the facts in these cases closely resemble the facts in Frank Sawyer Trust and Starnes--both cases where we decided not to collapse various transactions under uniform fraudulent conveyance statutes. In Starnes, the taxpayers each owned 25% of the stock of Tarcon, a freight consolidation corporation. The taxpayers had sold virtually all of the assets of Tarcon to an

unrelated third party, so that Tarcon had only cash and contingent Federal and State corporate income tax liabilities. Another unrelated third party (Midcoast) and the Tarcon shareholders entered into a contract to sell the Tarcon stock, where Midcoast was obligated to file corporate tax returns and report the capital gains arising from Tarcon's asset sales. After Midcoast failed to pay Tarcon's income tax liabilities, the Commissioner asserted a transferee liability action against the Tarcon shareholders.

In Frank Sawyer Trust, the taxpayer owned 100% of the stock in taxi corporations and real estate corporations. Like Starnes, the taxpayer had sold all the assets of the corporations to an unrelated third party, so that the corporations had only cash and contingent Federal and State corporate income tax liabilities. Another unrelated third party (Fortrend) and the taxpayer entered into a contract to sell the corporations' stock, where Fortrend was obligated to file corporate tax returns and report the capital gains arising from the corporations' asset sales. After Fortrend failed to pay the corporations' income tax liabilities, the Commissioner asserted a transferee liability action against the taxpayer.

In both Starnes and Frank Sawyer Trust, the corporations' assets were not used to purchase the stock from the taxpayer, but an independent third party (Rabobank) financed the transaction. Moreover, in both cases the corporations

were solvent at the time their stock was sold. Notice 2001-16, supra, had been released prior to the transaction in Starnes, but was released after the transactions in Frank Sawyer Trust.

We applied State fraudulent conveyance law in both cases to determine whether the taxpayers should be liable for the income tax liabilities of the corporations. Specifically, we focused on whether all of the parties involved had knowledge of the multiple transactions, including the fraudulent scheme to offset the tax liabilities. We held that because the Commissioner failed to show the taxpayers' knowledge of the fraudulent scheme, the transactions should not be collapsed. We then applied the relevant fraudulent conveyance statute without collapsing the transactions and found that because there was no fraudulent conveyance to the taxpayers, they were not liable as transferees.

We find the facts in these cases to be very similar to those in Starnes and Frank Sawyer Trust. The transaction between the Double-D Ranch shareholders and Shap II was conducted between two unrelated parties. The Double-D Ranch assets were not used to purchase the stock from the Double-D Ranch shareholders; rather, there was an independent infusion of cash in the form of a loan from Rabobank (another unrelated third party). Not only was Double-D Ranch solvent when sold, it had yet to incur any significant tax liability because it had not sold its

assets at the time of the stock sale.  Lastly, Notice 2001-16, supra, had not been released at the time this transaction was consummated.   As in Starnes and Frank Sawyer Trust, respondent has not carried the burden of proving we should collapse the transactions.  Accordingly, we will respect the form of the transactions in applying NYUFCA.

An opinion in another transferee case with similar facts has recently been filed--Feldman v. Commissioner, T.C. Memo. 2011-297, holding the taxpayer liable as a transferee.  However, in holding the taxpayer liable as a transferee, the Court in Feldman found that it was "absolutely clear" that the taxpayer was aware the stock purchaser had no intention of ever paying the tax liabilities and the "loan" used to purchase the stock was a sham because it was made by a shareholder of the purchaser and was not evidenced by a writing.  Moreover, the Feldman transaction took place after the issuance of Notice 2001-16, supra.  In our cases, the transaction took place before the issuance of Notice 2001-16, supra, the funds used to purchase the stock were lent by an independent third party, and the level of knowledge possessed by Double-D Ranch concerning Shap II's plans did not require further inquiry into the circumstances of the transaction.

N.Y. Debt. & Cred. Law sec. 273 requires respondent to show:  (1) a conveyance; (2) made without fair consideration; (3) by a person who was or will

be rendered insolvent by the conveyance. See United States v. McCombs, 30 F.3d at 323. At the time the Double-D Ranch shareholders sold their stock to Shap II, Double-D Ranch was solvent, possessing over $300 million in assets and no significant liabilities. Shap II paid money to the Double-D Ranch shareholders in exchange for the stock. After the stock sale was consummated, Double-D Ranch sold its assets to Morgan Stanley and used the proceeds to repay a prior loan from Rabobank. No assets were conveyed from Double-D Ranch to the Double-D Ranch shareholders. Because there was no conveyance of assets from Double-D Ranch to the Double-D Ranch shareholders that rendered Double-D Ranch insolvent, we find that there was no fraudulent conveyance under NYUFCA from Double-D Ranch to the Double-D Ranch shareholders. Therefore, the Diebold Foundation is not liable as a transferee under section 6901.

III. Transferee Liability of Petitioners

Finally, we must determine whether petitioners are liable as subsequent transferees of Double-D Ranch for the unpaid deficiency in corporate income tax, penalty, and interest due from Double-D Ranch for the short taxable year ended July 2, 1999. As previously mentioned, transferee liability may be asserted against a transferee of a transferee. Berliant v. Commissioner, 729 F.2d 496. The Commissioner may collect unpaid taxes of a transferor of assets from a transferee

or a successor transferee of those assets. Sec. 6901(a), (c)(2); Commissioner v. Stern, 357 U.S. at 42; Stansbury v. Commissioner, 104 T.C. 486, 489 (1995). Again, we apply New York law in determining whether petitioners are liable as subsequent transferees, and respondent bears the burden of proof.

Under N.Y. Debt. & Cred. Law sec. 273 respondent must prove: (1) a conveyance; (2) made without fair consideration; (3) by a person who was or will be rendered insolvent by the conveyance. United States v. McCombs, 30 F.3d at 323. Moreover, a person is insolvent when the "present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.Y. Debt. & Cred. Law sec. 271.

The Diebold Foundation transferred all of its assets to petitioners pursuant to its plan of dissolution approved by the Supreme Court of the State of New York, leaving the Diebold Foundation with no assets in the event that it was held liable as a transferee. However, because we hold that the Diebold Foundation is not liable as a transferee of the assets of Double-D Ranch, petitioners cannot be liable as transferees of a transferee. Therefore, we hold that petitioners are not liable under section 6901 as transferees of a transferee.

IV.  Conclusion

We conclude that respondent has not established that a fraudulent conveyance occurred under New York law.  In reaching our holding herein, we have considered all arguments of the parties, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decisions will be entered

for petitioners.