# United States Tax Court

T.C. Memo. 2024-15

CHRISTOPHER MEYER, TRANSFEREE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 1077-22.                    Filed February 5, 2024.

————————

*Allen Duane Webber*, *Sonya C. Bishop*, and *Phillip J. Taylor*, for petitioner.

*Kristina L. Rico*, *Philip M. Schreiber*, *Angela J. Ganase*, *Amanda K. Krugler*, *Laurel B. Stout*, *Daniel C. Chavez*, *Nathaniel C. Smith*, and *Deborah Aloof*, for respondent.

## MEMORANDUM OPINION

BUCH, *Judge*: Branch Brook, Inc. (Branch Brook), is a Delaware corporation. In 2000 it engaged in a MidCo transaction through which Branch Brook's shareholders sold all their stock in Branch Brook to BB Acquisition, LLC (BB Acquisition), making BB Acquisition its only shareholder. Shortly after, Branch Brook sold its securities to a brokerage firm. Thereafter, Branch Brook entered into a Son-of-BOSS transaction through which it purchased an option spread and contributed it to a partnership for an interest in the partnership. A few months later, Branch Brook resigned from the partnership and received cash and securities in exchange for its interest.

The Commissioner determined a deficiency and an accuracy-related penalty against Branch Brook for its 2000 tax year. He also determined that Christopher Meyer (petitioner), a former shareholder

[*2] of Branch Brook, was a transferee of Branch Brook for the 2000 tax year pursuant to section 6901[1] by recasting the MidCo transaction as an asset sale followed by a liquidating distribution.

Pending before the Court is petitioner's Motion for Summary Judgment in which he asks that we conclude that he is not a transferee of Branch Brook pursuant to section 6901 because (1) as a nonpartnership item, the period of limitation to recast the MidCo transaction has expired; (2) the Commissioner is collaterally estopped from asserting that the MidCo transaction was an asset sale followed by a liquidating distribution; and (3) the Commissioner is judicially estopped from taking the position that the MidCo transaction was an asset sale followed by a liquidating distribution.

Any transferor liability may be assessed against an initial transferee within one year after the period of limitation to assess the transferor's liability expires. I.R.C. § 6901(c)(1). Because the Commissioner issued a Notice of Transferee Liability to petitioner before the period of limitation ended, he is not precluded from recasting the MidCo transaction. Furthermore, the Commissioner is neither collaterally nor judicially estopped from recasting the MidCo transaction. For either doctrine to apply, all conditions of the doctrine must be met. Petitioner failed to meet this requirement for either doctrine to apply.

*Background*

The facts below are derived from the parties' pleadings and Motion papers. *See* Rule 121(c)(1). They are stated solely for the purpose of deciding the pending Motion and are not findings of fact for this case. *See Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994).

Branch Brook was incorporated in Delaware in 1925 and was in the business of buying and selling marketable securities. Petitioner and his brother James Meyer each inherited 25% of Branch Brook's stock when their father passed away in 1982. The other 50% of Branch Brook's stock passed to petitioner's cousins, Maurice Meyer III and Dorothy Purcell, when their father passed away in 1997. At the end of 1997,

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are shown in U.S. dollars and rounded to the nearest dollar.

**[*3]** Branch Brook's shareholders included petitioner, James Meyer, Maurice Meyer III, and Dorothy Purcell (shareholders).

In early 2000, the shareholders decided to sell their shares of Branch Brook stock. On April 3, 2000, Branch Brook, through its president, Maurice Meyer III, hired TranStar Capital Corp. (TranStar) to assist in identifying potential purchasers of Branch Brook stock. The agreement required Branch Brook to advance TranStar $150,000 for expenses.

I.     *The MidCo Transaction*

James Haber, president of the Diversified Group, Inc. (DGI), offered to purchase all of Branch Brook's outstanding stock for a price equal to 100% of cash on hand plus 93% of the fair market value of the securities owned by Branch Brook at the time of closing. Closing was to occur sometime during the first week of May 2000. The shareholders agreed to a stock purchase. To facilitate this stock purchase, DGI created BB Acquisition, which was formed in Wyoming with DGI as its manager and tax matters partner.

After the shareholders accepted Mr. Haber's offer, Branch Brook terminated its agreement with TranStar, and TranStar agreed to refund the $150,000 advance it had received.

On May 4, 2000, the shareholders entered into a Stock Purchase Agreement (SPA) with BB Acquisition. As required by the SPA, BB Acquisition purchased from the shareholders all of Branch Brook's outstanding stock for $49,290,000 and wired the funds to an account held by Maurice Meyer III, who in turn transferred $12,322,500 each to petitioner, James Meyer, and Dorothy Purcell.

On that same date, the shareholders entered into a separate agreement with BB Acquisition regarding the receivables they were due pursuant to the SPA. This separate agreement required BB Acquisition to remit to the shareholders amounts received in connection with those receivables, specifically: (1) the $150,000 refund from TranStar and (2) a federal tax refund claim of $22,314 plus interest. Both amounts were to be split four ways and later remitted to each shareholder.

BB Acquisition financed the stock purchase by obtaining a $55 million loan from Rabobank. To receive this loan, BB Acquisition was required (1) to enter into an agreement with Paine Webber, a brokerage firm, for Paine Webber to buy certain securities from Branch Brook and

[*4] (2) to agree to pay back the loan with interest by a specified time. To satisfy these requirements, the following series of transactions took place.

To facilitate the purchase of Branch Brook's stock, BB Acquisition opened a Rabobank account. Rabobank deposited $55 million into BB Acquisition's account. Then through its Rabobank account, BB Acquisition transferred $49,290,000 to Maurice Meyer III's account as required by the SPA.

To facilitate the sale of Branch Brook's securities, Branch Brook opened a Paine Webber account and a Rabobank account. On May 1, 2000, Branch Brook transferred its securities portfolio to its Paine Webber account. Then on May 4, 2000, Paine Webber and Branch Brook entered into an agreement for Paine Webber to purchase the securities portfolio from Branch Brook. The agreement provided that Paine Webber would purchase the securities at prices equal to their closing prices as of May 4, 2000, net its commission and other applicable fees. On May 5, 2000, Paine Webber transferred $52,053,920 to Branch Brook's Rabobank account. It later sold the securities it purchased from Branch Brook.

To pay back the loan to Rabobank, Mr. Haber[2] instructed Rabobank to transfer $50 million from Branch Brook's Rabobank account to BB Acquisition's Rabobank account. He then instructed Rabobank to debit BB Acquisition's Rabobank account $55 million plus interest to pay back the loan Rabobank had made to BB Acquisition.

After the stock purchase, BB Acquisition owned Branch Brook, and Branch Brook's assets consisted primarily of cash. The sale of its securities to Paine Webber resulted in gain of $47,548,583. This entire transaction structure has been described as a "MidCo" transaction. *See* I.R.S. Notice 2001-16, 2001-1 C.B. 730, *clarified by* I.R.S. Notice 2008-111, 2008-51 I.R.B. 1299; *see also Diebold Found., Inc. v. Commissioner*, 736 F.3d 172, 175–76 (2d Cir. 2013), *vacating and remanding Salus Mundi Found. v. Commissioner*, T.C. Memo. 2012-61.

---

[2] Mr. Haber was the president of DGI; DGI was the manager and tax matters partner of BB Acquisition; and BB Acquisition was the sole shareholder of Branch Brook. Mr. Haber made all relevant decisions for all three entities.

**[\*5]** II.     *Son-of-BOSS Transaction*

Following the MidCo transaction, Branch Brook undertook a series of transactions intending to generate a loss. On July 3, 2000, Branch Brook entered into an option spread with Lehman Brothers. Specifically, Branch Brook purchased a 91-day long option on Japanese yen with a premium of $50 million and wrote a 91-day short option of Japanese yen with a premium of $49,750,000. Then on July 13, 2000, Branch Brook contributed the option spread to AD Investment 2000 Fund LLC (AD Investment) for a membership interest. In determining its basis in AD Investment, Branch Brook disregarded the short option. *See Helmer v. Commissioner*, T.C. Memo. 1975-160, 34 T.C.M. (CCH) 727, 731.

On October 12, 2000, Branch Brook resigned from AD Investment, receiving cash of $270,769 and securities in exchange for its interest in AD Investment. Branch Brook then sold the securities for $78,168, resulting in a purported short-term capital loss of $49,773,953 for the sale of those securities. This transaction structure has been described as a Son-of-BOSS transaction. *See* I.R.S. Notice 2000-44, 2000-2 C.B. 255.

By offsetting the loss from this transaction against the gain on the sale of the Branch Brook securities portfolio, Branch Brook reported a net loss of $2,208,156 on its 2000 tax return.[3]

III.     *The Commissioner's Adjustments*

Through several notices, the Commissioner made adjustments to the reporting of AD Investment and Branch Brook.

The Commissioner issued a notice of final partnership administrative adjustment (FPAA) with respect to AD Investment's 2000 tax year on November 27, 2007. In short, the FPAA determined that AD Investment was a sham and should be disregarded. The FPAA also determined that various accuracy-related penalties would apply to the partnership-level adjustments. A petition would later be filed challenging the adjustments made in the FPAA.

On December 28, 2007, the Commissioner issued a notice of deficiency to Branch Brook for its 2000 tax year determining a deficiency

---

[3] This net amount also includes items that are unrelated to the issues discussed in this Opinion.

**[\*6]** of \$75,530 and an accuracy-related penalty of \$15,106. Those adjustments related to consulting fees and legal and professional fees. Because Branch Brook owned an interest in AD Investment, which was the subject of the FPAA, the December 28, 2007, notice of deficiency explicitly disregarded AD Investment, stating that "all partnership items, whether income, loss, deductions or credits, have been disregarded for purposes of computing a deficiency attributable to the adjustments in this notice." Branch Brook did not petition the Tax Court for a redetermination of the December 28, 2007, deficiency.

The November 27, 2007, FPAA was the subject of a Tax Court proceeding at docket No. 9177-08. In that proceeding, we upheld the Commissioner's determination to disregard AD Investment. *AD Inv. 2000 Fund LLC v. Commissioner*, T.C. Memo. 2015-223, *supplemented by* T.C. Memo. 2016-226. We found that AD Investment was engaging in a tax avoidance strategy that was marketed as a foreign currency investment strategy. *Id.* at \*5. That "strategy involve[d] the purchase and subsequent contribution of one or more option spreads to an entity purportedly classified as a partnership for Federal tax purposes." *Id.* The strategy was marketed to investors "as a permanent taxable loss in excess of its gain or loss for accounting purposes." *Id.* We held that AD Investment should not be recognized as an entity for federal tax purposes. *Id.* at \*29–30.

Following the conclusions of the partnership-level proceeding, the Commissioner issued Branch Brook a second notice of deficiency for the 2000 tax year on October 13, 2017. Predicated on the adjustments from the partnership-level proceeding, the October 13, 2017, notice of deficiency determined a deficiency of \$16,637,018 and an accuracy-related penalty of \$6,654,807. The October 13, 2017, notice also included an attachment describing the consequences of the partnership-level proceeding, specifically, that (1) AD Investment is disregarded; (2) transactions in which AD Investment engaged are deemed to have been engaged in directly by its partners; (3) contributions made by the partners to AD Investment are disregarded; (4) each partner is responsible for recognizing gains or losses associated with its respective contributed options and any subsequent trades entered into to close out the options; (5) a 40% gross valuation misstatement penalty applies; and (6) a 20% accuracy-related penalty applies to any other adjustments that are not subject to the 40% penalty. Because Branch Brook was a partner of AD Investment, these consequences applied to it. *Id.* at \*6. In short, the Commissioner based the deficiency and accuracy-related penalties on the Tax Court's ruling in *AD Investment 2000 Fund LLC*. Branch

**[*7]** Brook did not file a petition for redetermination of the October 13, 2017, deficiency.

IV.    *Notice of Transferee Liability*

On November 9, 2021, the Commissioner issued to petitioner a Notice of Transferee Liability for Branch Brook's 2000 tax year, determining him to be liable for a portion of the liability of Branch Brook. The November 9, 2021, Notice sets forth Branch Brook's liability of $16,637,018 of tax plus a penalty of $6,654,238 and determines that petitioner is liable for $13,017,216 of that amount. In this Notice, the Commissioner informed petitioner that a portion of Branch Brook's liability is being assessed against him because it was determined that Branch Brook transferred assets to petitioner, or alternatively, that Branch Brook made transfers from which petitioner benefited, with either determination making him a transferee of Branch Brook. The notice goes on to state:

> The transfers to you are voidable under state law. The transferor made the transfers with actual intent to hinder, delay or defraud a creditor. They were also constructively fraudulent. Branch Brook, Inc. did not receive reasonably equivalent value or fair consideration in exchange for the transfers. Branch Brook, Inc. was engaged or about to engage in a transaction for which its remaining assets were unreasonably small. Branch Brook, Inc. intended or believed or reasonably should have believed it would incur liabilities beyond its ability to pay as they became due. These and related transfers rendered Branch Brook, Inc. insolvent.

The Commissioner's determination that petitioner is a transferee is premised on his position that the MidCo transaction should be recast as an asset sale followed by a liquidating distribution from Branch Brook to the shareholders.

While residing in California, petitioner filed a Petition challenging the Commissioner's transferee liability determination. In his Petition, he alleges that he is not a transferee of Branch Brook or BB Acquisition and that the period of limitation for the Commissioner to make either determination expired before he was issued the Notice of Transferee Liability.

[*8]  On February 27, 2023, petitioner filed a Motion for Summary Judgment asking the Court to find as a matter of law that he is not a transferee of Branch Brook because (1) the period of limitation to recast the MidCo transaction expired before the Notice of Transferee Liability was issued; (2) the Commissioner is collaterally estopped from relitigating facts that this Court has already decided in *AD Investment 2000 Fund LLC*; and (3) the Commissioner is judicially estopped from taking a position in this case that is contrary to a position advanced in *AD Investment 2000 Fund LLC*. The Commissioner objects.

## *Discussion*

Before the Court is petitioner's Motion for Summary Judgment. Although framed as three separate arguments, the question underlying each argument is whether the Commissioner is precluded from recasting the MidCo transaction for purposes of determining that petitioner is liable as a transferee of Branch Brook pursuant to section 6901 for the 2000 tax year.

### I.  *Summary Judgment Standard*

We may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(a)(2); *Sundstrand Corp. v. Commissioner*, 98 T.C. at 520. The moving party bears the burden of showing that there is no genuine dispute as to any material fact. *Sundstrand Corp.*, 98 T.C. at 520. When a motion for summary judgment is properly made and supported, an opposing party may not rest on mere allegations or denials. Rule 121(d). Rather, the party's response, by affidavits or declarations, or as otherwise provided in Rule 121, must set forth specific facts showing there is a genuine factual dispute for trial. Rule 121(c) and (d). In deciding whether to grant summary judgment, we view the facts and make inferences in the light most favorable to the nonmoving party. *Sundstrand Corp.*, 98 T.C. at 520.

### II.  *Section 6901 Transferee*

Section 6901 provides that the Commissioner may assess tax against the transferee of property of a taxpayer that owes income tax. I.R.C. § 6901(a)(1)(A)(i); *Diebold Found., Inc. v. Commissioner*, 736 F.3d at 183–84. It specifically provides that the "liability, at law or in equity, of a transferee of property" shall be "assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in

**[\*9]** the case of the taxes with respect to which the liabilities were incurred." I.R.C. § 6901(a)(1)(A).

But for the Commissioner to assess transferee liability, two requirements must be met. A court must determine first whether "the party [is] a 'transferee' under § 6901 and federal tax law" and second whether "the party [is] substantively liable for the transferor's unpaid taxes under state law." *Salus Mundi Found. v. Commissioner*, 776 F.3d 1010, 1018 (9th Cir. 2014), *rev'g and remanding* T.C. Memo. 2012-61; *see also Slone v. Commissioner*, T.C. Memo. 2022-6, at \*6–7, *supplementing* T.C. Memo. 2016-115. However, petitioner addresses only the first prong; namely, whether the Commissioner is precluded from characterizing petitioner as a transferee pursuant to section 6901. For purposes of deciding this Motion, we will address only petitioner's arguments related to that specific issue. We make no determination as to whether petitioner is a transferee under section 6901.

III.    *Parties' Arguments*

Petitioner asserts that the Commissioner cannot recast the MidCo transaction as an asset sale followed by a liquidating distribution of the proceeds to its shareholders for the purpose of deeming petitioner to be a transferee under section 6901. He puts forth three arguments to support this assertion. First, he argues that the period of limitation to recast the transaction expired no later than May 29, 2008 (or May 29, 2009, in relation to an alleged transferee), because the recast is a nonpartnership item. Next, he argues that the Commissioner is collaterally estopped from recasting the transaction. And lastly, he argues that the Commissioner should be judicially estopped from recasting the transaction.

The Commissioner disagrees. He argues that petitioner's Motion should be denied because (1) there is an issue of material fact as to whether petitioner is a transferee under section 6901; (2) the Notice of Transferee Liability was issued to petitioner before the period of limitation expired; and (3) neither collateral estoppel nor judicial estoppel bars his recasting the MidCo transaction.

IV.    *Whether the Period of Limitation Has Expired*

A.    *Burden of Proof*

"The expiration of the period of limitation on assessment is an affirmative defense, and the party raising it must specifically plead it

**[\*10]** and carry the burden of proving its applicability." *Amesbury Apartments, Ltd. v. Commissioner*, 95 T.C. 227, 240 (1990); *see also* Rule 39. This general rule applies to a taxpayer advancing a limitations defense in a transferee liability case. *Tr. u/w/o Namm v. Commissioner*, T.C. Memo. 2018-182, at \*11.

To establish a limitations defense,

the taxpayer must make a prima facie case establishing the filing of the . . . return, the expiration of the statutory period, and receipt or mailing of the notice after the running of the period. Where the party pleading the defense makes such a showing, the burden going forward with the evidence shifts to [the Commissioner] who must then introduce evidence to show that the bar of the statute is not applicable. Where [the Commissioner] makes such a showing, the burden of going forward then shifts back to the party pleading the affirmative defense to show that the alleged exception to the expiration of the period is invalid or otherwise inapplicable.

*Amesbury Apartments, Ltd.*, 95 T.C. at 240–41 (citations omitted). However, "the burden of proof, i.e., the burden of ultimate persuasion . . . never shifts from the party who pleads the bar of the statute of limitations." *Id.* at 241.

B.  *Applicable Statutes of Limitations*

Section 6501(a) provides that the Commissioner must generally assess tax within three years after a return is filed. However, section 6501 points us to section 6229 for periods of limitation related to partnership items. I.R.C. § 6501(n)(2). Section 6229(a) addresses "the period for assessing any tax imposed by subtitle A with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year." It provides that the assessment period generally "shall not expire before the date which is 3 years after the later of—(1) the date on which the partnership return for such taxable year was filed, or (2) the last day for filing such return for such year (determined without regard to extensions)." I.R.C. § 6229(a). Thus, section 6229 provides a minimum period within which the Commissioner may adjust partnership items. *See Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner*, 114 T.C. 533, 542 (2000). In effect, in situations where sections 6501(a) and 6229(a) both

**[\*11]** apply, the longer of the two periods controls. *Rhone-Poulenc*, 114 T.C. at 540–41.

Section 6901(c) specifies the period of limitation for assessing the tax of a transferor against a transferee. It provides that "[t]he period of limitation[] for assessment of any such liability of a transferee . . . shall be as follows:" for an initial transferee, the tax generally must be assessed "within 1 year after the expiration of the period of limitation for assessment against the transferor," and for a transferee of a transferee, the tax must generally be assessed "within 1 year after the expiration of the period of limitation for assessment against the preceding transferee, but not more than 3 years after the expiration of the period of limitation for assessment against the initial transferor." I.R.C. § 6901(c)(1) and (2). Section 6901(c) does not include an explicit reference to either section 6501 or section 6229.

C.    *Analysis*

We must decide whether the period of limitation for the Commissioner to assess transferee liability against petitioner expired before the Commissioner issued the Notice of Transferee Liability. Petitioner argues that the period of limitation to assert that he is a transferee of Branch Brook on account of the recast of the MidCo transaction expired before the Commissioner issued the Notice of Transferee Liability. Specifically, he argues that the recast is governed by the statute of limitations in section 6501, without regard to section 6229. Starting from this premise, petitioner contends that the period of limitation to assess the liability of Branch Brook on account of the recast expired no later than May 29, 2008, and the period of limitation to assess any transferee liability on account of the recast expired no later than May 29, 2009. Because the Commissioner issued the Notice of Transferee Liability on November 9, 2021, petitioner argues that the Notice is untimely.

To resolve petitioner's argument, we must address two preliminary issues. First, we must determine the proper construction of the statute of limitations for transferees under section 6901(c), specifically, whether there are separate periods of limitation for assessing liabilities related to partnership items and nonpartnership items. Then we must determine the actual period of limitation for assessing transferee liability against petitioner.

**[\*12]**   1.   *Whether There Are Separate Limitation Periods for Partnership and Nonpartnership Items*

To determine the proper reading of the statute of limitations under section 6901(c), we begin with the text of the statute. *See Ross v. Blake*, 578 U.S. 632, 638 (2016). And "[u]nless the statute is ambiguous, our inquiry begins and ends with the statute's plain language." *Shockley v. Commissioner*, 686 F.3d 1228, 1235 (11th Cir. 2012), *rev'g and remanding* T.C. Memo. 2011-96. We are also mindful of the Supreme Court's well-established rule that "[s]tatutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government." *Badaracco v. Commissioner*, 464 U.S. 386, 391–92 (1984) (quoting *E.I. Dupont de Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924)); *see also Shockley v. Commissioner*, 686 F.3d at 1235.

Section 6901(c)(1) provides that in the case of an initial transferee "[t]he period of limitations for assessment *of any such liability* of a transferee . . . shall be . . . within 1 year after the expiration of the period of limitation for assessment against the transferor." (Emphasis added.)[4] The plain terms of this statute make it clear that there is only one period of limitation for assessment of transferee liability.

Petitioner would have us read into the statute separate periods for different underlying tax adjustments. But under the omitted-case cannon, "nothing is to be added to what the text states or reasonably implies." Antonin Scalia & Byran A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012) (describing the omitted-case canon); *see also United States v. Mississippi*, 82 F.4th 387, 392–93 (5th Cir. 2023). The statute focuses on whether the liability sought to be assessed against the transferee is assessed within one year of the period of limitation on assessment for that liability against the transferor. It does not distinguish between the type of item upon which the transferor's liability is premised when determining the period of limitation under section 6901(c). Therefore, there are no separate periods of limitation for partnership items and nonpartnership items when determining whether a period of limitation to assess a transferee

---

[4] Section 6901(c) provides a period of limitation to assess a transferor's tax against an initial transferee. I.R.C. § 6901(c)(1). It also provides a separate rule further extending the period of limitation for a transferee of a transferee. I.R.C. § 6109(c)(2). Because we conclude that the period of limitation is open under the initial transferee rule, we need not consider whether petitioner is a transferee of a transferee.

**[\*13]** liability has expired under section 6901(c). We simply look to when the period of limitation against the transferor expires.

Petitioner points to section 6901(a) as support for his argument. Section 6901(a) provides that transferee liability "shall . . . be assessed, paid, and collected in the *same manner and subject to the same provisions and limitations* as in the case of the taxes with respect to which the liabilities were incurred." (Emphasis added.) Petitioner argues that, if the Commissioner cannot revisit and recast the MidCo transaction with respect to Branch Brook at this time because it is a nonpartnership item, then neither can he recast the transaction to deem petitioner a transferee. Petitioner is mistaken. The Commissioner is not prohibited from recasting the stock sale because he is not seeking to recast the transaction for the purpose of determining a new liability. The liability has already been determined and assessed. The recast is solely for the purpose of determining whether petitioner was a transferee. Therefore, allowing the Commissioner to recast the transaction to assert transferee liability is not contrary to section 6901(a).

Accordingly, section 6901(c) does not provide separate periods of limitation for partnership items and nonpartnership items.

### 2.    *Section 6901(c) Limitation Period*

Next, we must determine whether the period of limitation for assessing transferee liability against petitioner expired before the Notice of Transferee Liability was issued. Petitioner has not established that the Notice of Transferee Liability was issued after the period of limitation expired. Interpreting facts in a light most favorable to the nonmoving party shows that the period of limitation on assessment of tax attributable to items of AD Investment remained open from the time of the filing of the AD Investment 2000 partnership return until the Commissioner issued the Notice of Transferee Liability to petitioner.

AD Investment filed a Form 1065, U.S. Return of Partnership Income, for 2000 on December 14, 2001. Under section 6229(a), the period of limitation for assessing tax attributable to adjustments to partnership items would have expired no earlier than December 14, 2004. *See Rhone-Poulenc*, 114 T.C. at 542. However, through a series of Forms 872–P, Consent to Extend the Time to Assess Tax Attributable to Partnership Items, the tax matters partner of AD Investment agreed to extend the period of limitation to December 31, 2007. *See* I.R.C. § 6229(b).

**[\*14]** The Commissioner issued an FPAA with respect to AD Investment on November 27, 2007. When the FPAA was issued, 34 days remained in the period of limitation. That FPAA suspended the running of the period of limitation for assessing tax attributable to adjustments to partnership items for at least 150 days. *See* I.R.C. §§ 6226(a) and (b), 6229(d). Because a petition was filed with respect to that FPAA, the period remained suspended until a decision was entered and became final. *See* I.R.C. § 6229(d)(1). We entered a decision with respect to the November 27, 2007, FPAA on December 16, 2016, and that decision became final on March 16, 2017. *See* Rule 190. Under section 6229(d)(2), the period of limitation on assessment would remain suspended for a year after the decision became final. As of March 16, 2018, the period of limitation would resume running with 34 days remaining. *See* I.R.C. § 6229(d). Accordingly, the Commissioner had until April 19, 2018, to assess tax attributable to adjustments to partnership items on Branch Brook.

But on October 13, 2017, with at least 188 days remaining in the period of limitation, the Commissioner issued a notice of deficiency to Branch Brook. The notice suspended the period of limitation for 150 days. *See* I.R.C. §§ 6213(a), 6503(a)(1). Because Branch Brook did not file a petition with respect to that notice of deficiency, the period of limitation resumed running on March 12, 2018, with 188 days remaining. Thus, the period of limitation on assessment against Branch Brook for tax attributable to adjustments to partnership items would have lapsed no earlier than September 16, 2018.

For initial transferees, however, the Commissioner has an additional year within which to make an assessment. I.R.C. § 6901(c)(1). For petitioner, that would make the assessment deadline no earlier than September 16, 2019, which is one year after the period of limitation on assessment against Branch Brook for tax attributable to adjustments to partnership items expires. Long before that date, petitioner entered into a series of written agreements to extend the period of limitation. *See* I.R.C. § 6901(d). That series of written agreements extended the deadline for assessment to December 31, 2021. The Commissioner issued the Notice of Transferee Liability to petitioner on November 9, 2021, which is within the period of limitation.

V.   *Whether Collateral Estoppel Applies*

Collateral estoppel precludes parties (and their privies) from relitigating in subsequent suits issues that were actually and

**[\*15]** necessarily decided by a court of competent jurisdiction. *Montana v. United States*, 440 U.S. 147, 153 (1979); *Peck v. Commissioner*, 90 T.C. 162, 166 (1988), *aff'd*, 904 F.2d 525 (9th Cir. 1990). It "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Senyszyn v. Commissioner*, T.C. Memo. 2016-137, at \*5 (quoting *Parkland Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)), *supplementing* 146 T.C. 136 (2016). It also "fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana*, 440 U.S. at 154.

For collateral estoppel to apply, the following conditions must be met:

(1) The issue in the second suit must be identical in all respects with the one decided in the first suit.

(2) There must be a final judgment rendered by a court of competent jurisdiction.

(3) Collateral estoppel may be invoked against parties and their privies to the prior judgment.

(4) The parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision.

(5) The controlling facts and applicable legal rules must remain unchanged from those in the prior litigation.

*Peck*, 90 T.C. at 166–67 (citations omitted). Petitioner argues that the Commissioner is collaterally estopped from disregarding and recasting the MidCo transaction as an asset sale followed by a liquidating distribution of proceeds to the shareholders. He contends that in *AD Investment 2000 Fund LLC*, we found that for federal tax purposes the shareholders sold their Branch Brook stock, BB Acquisition acquired control of Branch Brook, that Branch Brook retained assets long after May 4, 2000, and that Branch Brook continued to exist as a corporation for many months after May 4, 2000. Therefore, petitioner argues, by attempting to recast the MidCo transaction, the Commissioner is relitigating facts already established by this Court in *AD Investment 2000 Fund LLC*. We disagree.

**[\*16]**  For collateral estoppel to apply, all five conditions must be met, and they are not. First, the contested issues in this case and *AD Investment 2000 Fund LLC* are not identical in all respects. Issues are not identical "[i]f the legal matters determined in the earlier case differ from those raised in the second case." *Commissioner v. Sunnen*, 333 U.S. 591, 599–600 (1948). In *AD Investment 2000 Fund LLC*, T.C. Memo. 2015-223, at \*3, the issue was whether certain limited liability companies should be respected for federal tax purposes when they were involved in transactions that allow taxpayers to use offsetting options to artificially inflate their bases in their partnership interests. Here, the issue is whether the Branch Brook shareholders' sale of stock should be disregarded and recast to deem them transferees of the corporation. Although the cases involve related entities, they involve separate facts and separate issues.

Secondly, the issue of whether the MidCo transaction should be disregarded was not actually litigated in *AD Investment 2000 Fund LLC*. Petitioner points to the findings of fact in *AD Investment 2000 Fund LLC* as support for concluding that we previously decided for federal tax purposes that BB Acquisition acquired the Branch Brook stock from its shareholders pursuant to a stock sale. But in *AD Investment 2000 Fund LLC* we merely discussed the mechanics of the stock sale, not whether it was a stock sale in substance for federal tax purposes. We were not presented with that question. Here, the Commissioner does not dispute the form of the transaction, meaning that there was a sale of Branch Brook stock; rather, the Commissioner is challenging the substance of the shareholders' sale of Branch Brook stock. This was not litigated in *AD Investment 2000 Fund LLC*, and the Commissioner is not precluded from litigating this issue here.

Because we have found that two conditions of collateral estoppel were not met, we need not address the others. Accordingly, collateral estoppel does not apply to prevent the Commissioner from recasting the MidCo transaction.

VI.  *Whether Judicial Estoppel Applies*

"Judicial estoppel is an equitable doctrine that prevents parties in subsequent judicial proceedings from asserting positions contradictory to those they previously have affirmatively persuaded a court to accept." *Huddleston v. Commissioner*, 100 T.C. 17, 26 (1993). It

**[\*17]** focuses on the relationship between a party and the courts, and it seeks to protect the integrity of the judicial process by preventing a party from successfully asserting one position before a court and thereafter asserting a completely contradictory position before the same or another court merely because it is now in that party's interest to do so.

*Id.*

Courts typically look at the following factors in determining whether the doctrine of judicial estoppel applies:

    (1) A party's later position must be clearly inconsistent with its earlier position;

    (2) The party has succeeded in persuading a court to accept its earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and

    (3) The party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001). Petitioner argues that the Commissioner should be judicially estopped from disregarding and recasting the MidCo transaction as an asset sale by Branch Brook followed by a liquidating distribution of proceeds to the shareholders. He contends that in *AD Investment 2000 Fund LLC*, the Commissioner took the position that the shareholders of Branch Brook sold their Branch Brook stock to BB Acquisition. And by attempting to recast the transaction, the Commissioner is taking a position here that is inconsistent with the position taken in *AD Investment 2000 Fund LLC*. Petitioner further argues that if we allow the Commissioner to take this position now, the Commissioner will have an unfair advantage over, and impose an enormous detriment on, petitioner. We disagree.

The Commissioner is not taking a position in this case that is inconsistent with the position taken in *AD Investment 2000 Fund LLC*. As previously stated, the Commissioner is not disputing the mechanics and the form of the stock sale, but he is disputing the actual economic substance of the transaction. The substance of the shareholders' sale of Branch Brook stock to BB Acquisition was not disputed or litigated in

**[\*18]** the prior case. That case considered the substance of the Son-of-BOSS transaction involving Branch Brook and AD Investment. *See AD Inv. 2000 Fund LLC*, T.C. Memo. 2015-223. The Commissioner took a position on the substance of the Son-of-BOSS transaction in *AD Investment 2000 Fund LLC*, not the MidCo transaction. Therefore, we decline to apply the doctrine of judicial estoppel to this case.

VII.    *Conclusion*

Petitioner failed to establish that the Commissioner is precluded from recasting the MidCo transaction as an asset sale followed by a liquidating distribution. Accordingly, we will deny petitioner's Motion for Summary Judgment.

To reflect the foregoing,

*An appropriate order will be issued.*